McIntosh & Cathro, Appellees, v. Ken E. Penney et al., Appellants.

**PRINCIPAL AND AGENT:** Evidence in re Agency. Evidence reviewed, and held quite insufficient to establish the agency alleged.

**PRINCIPAL AND AGENT:** Special Agency. Principle recognized that an agent armed with authority to perform a *special* act has no implied authority beyond what would ordinarily be expected to be used in performing such an act.

*Appeal from Black Hawk District Court.*—George W. Dunham, Judge.

December 14, 1920.

Suit on two promissory notes for $771.83 each, dated April 12, 1917, made by defendants to plaintiffs. Defendants claim that the notes are void because of noncompliance with a contract which they claim was entered into when the notes were given. At the close of the evidence, the court directed a verdict for plaintiffs. Defendants appeal.—*Affirmed.*

*Mears & Lovejoy* and *James G. Clark,* for appellants.

*Chas. W. Humphrey* and *Edwards, Longley, Ransier & Harris,* for appellees.

Arthur, J.—The decision of this case depends largely, and perhaps entirely, upon the determination of the question of agency: that is, whether or not Frank Collins was the agent of the plaintiffs, and had authority to bind them in the transaction involved. An examination of that question makes it necessary, in order to make this opinion intelligent to the reader, that much of the record be set out.

1. Principal and agent: evidence *in re* agency.

On June 19, 1916, defendant Ken E. Penney and plaintiffs entered into a written contract, by the terms of which Ken E. Penney bought from plaintiffs 200 acres of land in Bottineau County, North Dakota, at the price of $17,600, of which $2,000 was payable in cash, and the balance payable by application of not less than one half of the profits for a period of years. The first payment was not made in cash, but by a note for $2,000, due September 1, 1916. When this $2,000 note became due, it was not paid, but the proceeds of the crop for 1916, in the sum of $573.46, were indorsed on the note.

On April 10, 1917, defendant Ken E. Penney addressed to plaintiffs a letter as follows:

"Have had a talk with Frank Collins this morning and at his suggestion I am writing you and ask that you send me two notes in amount equal to the amount of my present indebtedness—one due in thirty days and one in sixty days. These notes will be indorsed or executed by the Mrs. and myself. Unfortunately, I have been delayed in getting the funds with which I expected to take up my indebtedness, owing to the fact that there were some details of my deal from which I expected to get these funds that we have been unable, up to the present time, to get straightened out. I expect, however, that this will be done within a few days and may even be, now, as I have been away from home and out of touch with my attorneys for the past five weeks. I sincerely appreciate the courtesy of both yourself and Mr. McIntosh in this matter."

On April 12, 1917, in conformity with Penney's letter of April 10th, plaintiffs wrote Penney a letter as follows:

"We enclose herewith two notes for $771.83 each, dated April 12, 1917, due in thirty and sixty days respectively, the

aggregate being the amount due today on your note of $2,000, dated June 19, 1916, and past due since Sept. 1, 1916. We understand you and Mrs. Penney are to sign these two notes and return them to us in lieu of the past-due note above referred to.''

On April 24th, plaintiffs wired Penney as follows:

''What about notes sent you our letter April 12th. Answer.''

In the meantime, and on April 10th, the same day that Penney wrote requesting plaintiffs to send two notes for execution by himself and wife, Penney and Collins met, and made a written contract by which Penney became an agent for Collins in the sale of land. Penney and Collins had been discussing this and other matters since about March 1, 1917. Early in May, 1917, Collins went to Rudd, Iowa, where the Penneys lived, as he says, ''to attend to some land business,'' and to see his agent, Haynes, and also Penney, with reference to what lands he would undertake handling under his contract. At that time, the matter of the execution of the two notes sent by plaintiffs to Penney on April 12th, came up. It appears undisputedly that Collins had had nothing to do with the land contract between Penney and plaintiffs. At Penney's request, Collins then wrote plaintiffs for information about seed for the land, and Collins also sent in to plaintiffs a check for $335, arising from crops on the premises, payable to plaintiffs. The two notes in suit for $771.83 each, dated April 12, 1917, due June 12, 1917, and September 12, 1917, were signed by Ken E. Penney and Laura D. Penney, and returned to plaintiffs by Collins. Shortly thereafter, plaintiffs returned to Penney the $2,000 note, with indorsement thereon, which was paid by the two notes in suit. These two notes were not paid when due; and, on October 23, 1917, plaintiffs began this action thereon.

On March 28, 1919, defendants filed separate answers, alleging, among other things, that the notes were executed in pursuance of a contract entered into between them and Frank Collins, as the agent of plaintiffs, upon the express terms and conditions that the contract of purchase between the defendant Ken E. Penney and the plaintiffs, for the real estate described

in the contract, was to be abandoned, and that a new contract was to be made, with Laura D. Penney as the purchaser, she to have credits belonging to Ken E. Penney; that the notes in suit were executed by defendants and delivered to Collins, the agent of plaintiffs, with the understanding that they should be delivered to plaintiffs, to be binding upon defendants only upon the express condition that, within a period of ten days or two weeks from the date of the signing of said notes, plaintiffs would execute and deliver to Laura D. Penney a written contract, evidencing her purchase of the real estate; and that the plaintiffs failed to execute and deliver to defendant Laura D. Penney the written contract evidencing her purchase of the real estate.

The contract, which it is claimed was entered into early in May, 1917, when the notes in suit were signed and returned to plaintiffs, was not reduced to writing, and was never furnished by the plaintiffs, and was never made by the plaintiffs, unless plaintiffs made such contract through Collins, as their agent.

In a letter dated April 3, 1918, about five months after the suit was begun, which McIntosh wrote Penney, answering a letter from Penney to him concerning their land deal, among other things he said:

"Now if there is anything in this matter that I can do to make an all around agreeable settlement, I would be willing to make a trip to Minneapolis as I very much hate litigation. I would suggest that you and Mrs. Penney intimate what you will do, and perhaps we can compromise matters."

Replying, under date of April 8, 1918, Penney wrote:

"Now as to the settlement: I cannot say anything as Mrs. Penney is the whole proposition in that. Unfortunately in the past two years my affairs have taken such a turn that I am execution proof, and Mrs. Penney is the only one who is interested. The attachment which you placed on her land I am frank to tell you is of no avail whatever as her signature was obtained by gross misrepresentation and no part of the agreement which Frank Collins made at the time that she signed those notes have

ever been kept by you. I do not blame you for I do not think that you knew anything about it, except the fact that the notes were returned to you with her signature, but he was your agent in the matter and consequently you are liable for his act.''

On April 11, 1918, McIntosh again wrote Penney, saying:

''Replying to yours of April 8th, I note what you say about Frank Collins. I do not know what inducement he held out, but hope that he did not mislead you. We have never had him acting in the capacity of our agent.''

Ken E. Penney and Laura D. Penney and their daughter, Gwendolyn Penney, testified concerning the transaction of signing the notes in suit, and the conditions upon which they were signed and given to Collins, to be delivered to plaintiffs. The testimony was admitted over objections made by plaintiffs. Ken E. Penney testified that, early in May, 1917, Frank Collins called at his house in Rudd, Iowa, and said he had a letter from McIntosh & Cathro, in which they asked him to get a renewal of the amount due on the original note of $2,000, and produced from his wallet two notes for signature, and insisted that he and Mrs. Penney sign them; that Mrs. Penney at first refused, but finally consented, through an agreement reached that she would sign the notes provided a new contract was drawn in her favor, so that she was named the purchaser of the land, and she would have credit for anything Penney might have paid on the old contract; that the new contract was to be delivered, and that her signature to the notes was obtained under the distinct understanding that the new contract would come to her and be delivered within ten days or two weeks; that, under those conditions, Laura D. Penney signed the notes; that one of the notes became due too early, and Collins tore it up, and wrote the note which fell due September 12, 1917; that this note falling due on September 12, 1917, was written by Collins on a blank note which he took from his wallet; that, after the notes were signed, Frank Collins put them in his wallet; and that the next time witness saw them was on the trial of this case. Penney further testified that he received a letter from McIntosh & Cathro in regard to seed grain, and that, before he had arranged for

money, Collins came to his office in Minneapolis, and insisted that he give him a check with which to buy seed corn, in the amount of $325; that he delivered a check for that amount to Collins, payable to McIntosh & Cathro, and received credit therefor; that he had talked with Collins before, about what he owed McIntosh & Cathro, and Collins asked him to pay the contract, and insisted on additional security; that he had suggested to Collins that he was willing to renew the paper.

Laura D. Penney testified that she remembered that her husband received by letter two notes for them to sign; that the notes came a month or six weeks before they met and talked with Collins about them; that Collins came to their house some time between the 1st and the 10th of May, in regard to their signing the notes; that he had two notes with him, typewritten; that he took them out of a wallet that he had in his pocket; that Collins, for the purpose of getting her signature, which she absolutely refused to give, except under one condition, that she was to have a new contract made out by McIntosh & Cathro, within ten days or two weeks, otherwise her signature to the notes was to be no good, approved this proposition; that the contract never came, and she considers herself not obligated; that Collins said he was satisfied with her proposition, and would see that the contract was made out to her and returned to her within ten days or two weeks; that, of the two notes actually signed by her, one was typewritten, and the other was written by Collins; that the notes sent by McIntosh & Cathro she pigeonholed, and they were in her house the day she signed the two notes in suit, and they are there yet. She further testified that, in the fall of 1915, Collins introduced her to McIntosh & Cathro, and McIntosh & Cathro took her to see different pieces of land, including the land in controversy, which her husband bought; that, after signing the notes in controversy, she had a talk with Collins in Minneapolis; that she asked him about the contract, and why he never delivered it, and he asked her if they were ready to pay, and she told him that the contract was not furnished within ten days or two weeks, and that she was entirely out of the matter; that she told Collins that he thoroughly understood what the agreement was; that the notes were signed only under one condition, which was that, inside of ten days or two weeks,

there was to be an entirely new contract made out from Mc-Intosh & Cathro and delivered to her,—otherwise, her name was to be no good at all on the notes; and that Collins understood it; that, when Collins came to their house, he said he had just had a letter from McIntosh, telling him to call on them and get the matter straightened up; that she had a conversation with Frank Collins, wherein he stated that no land that McIntosh & Cathro had an interest in could be purchased by anyone except through him.

Gwendolyn Penney, daughter of Ken E. Penney and Laura D. Penney, testified that she remembered the coming of Collins to their home at Rudd; that Collins came on some business with her folks; that he wanted her mother to sign some notes; that her mother said she would sign the notes under one condition only, and that was that a new contract be made out to her, and returned to her in a week or ten days; that Collins agreed to that; that Collins made out one new note.

Witnesses for plaintiffs testified as follows:

E. D. Bowers, witness. (It is admitted that E. D. Bowers was general agent for McIntosh & Cathro.) Bowers testified that he is assistant cashier of the First National Bank of Bottineau, and has been in the employ of McIntosh & Cathro for 13 years, and had authority to transact business for them; that he remembered the contract and notes of the Penney deal; that the $2,000 note was not paid when due; that the note had an indorsement on it of $572; that he wrote Penney about the payment of the note; that he remembered receiving the letter wherein Penney asked to have the two notes made out and sent to him, to take up the $2,000 note; that he wrote the letter inclosing the two notes to Penney that Penney requested; that he wrote the notes out on a typewriter; that one of the notes signed was one that he sent; that the other note was on a form used in their bank; that he never sent Collins any note for the Penneys to execute; that he did not direct Collins to prepare any notes; that he received the notes back in a letter from Collins; that the letter stated that Mrs. Penney wanted an extension of time on one of them; that the first he knew that Mrs. Penney claimed she was to have a contract to herself was when the answer in this case was filed; that he handled the matter of

collecting the notes for McIntosh & Cathro, and was the only one authorized to make collection; that Frank Collins was never authorized to collect for them, and was never authorized to make any settlement with respect to the Penney notes; that, when the notes came back, he found that one had been extended from the due date that he placed upon it; that the due date was changed from May 12th to September 1st; that the note was in the handwriting of Collins.

Frank Collins testified that he knew the defendants; that he met them in Rudd; that his business was selling land; that he met Penney in Minneapolis in 1917; that he talked with him about the farm he bought in Bottineau County; that he wrote to Penney with regard to seed corn, and Penney also gave him $325, and asked him to send it to McIntosh & Cathro, and to explain to them why it had not been sent before; and that he mailed the money to McIntosh & Cathro; that he, for himself, made a contract with Penney about April 10, 1917, for the handling of land by Penney for him; that Mr. and Mrs. Penney wanted to handle some of his land, and a contract was made for that purpose; that, while they were talking about the deal between him and the Penneys, the Penneys mentioned the notes owed to McIntosh & Cathro, and said that they were uneasy about the notes, and were figuring how to pay them; that they both said they were due in a short time; that he told them he thought, after they asked him, that they could get more time; that they finally figured to pay one in 60 days, and the other September 1st; that he got a blank note out of his grip, and made that out due September 1st, and Mrs. Penney signed the notes; that, when she signed the notes, she said that Penney would have to assign the land contract to her; that he (Collins) did not have much to say about the family affair; that they asked him to take the notes and send them to McIntosh & Cathro; that the two notes in controversy are the notes that were given him by the Penneys and signed; that he wrote the second one; that the first note, Mrs. Penney gave him; that he had done business with the First National Bank at Bottineau a long time, and got from the bank the blank note that he made out; that he might have had it several years; that he did not carry any notes from McIntosh & Cathro there with him; that he had nothing to do in

behalf of McIntosh & Cathro in securing the new notes, or in payment of the old note; that he only acted in a friendly way; that he had nothing to do with the sale of the land to the Penneys; that, in the past, he had corresponded with McIntosh & Cathro in regard to buying and selling land; that he had bought some land from them; that he had no contracts with them now; that he never demanded of the Penneys the payment of the $2,000 note; that he went to see the Penneys on his own business; that they had already signed a contract with him, some three or four weeks before the signing of these notes; that he wrote to McIntosh & Cathro about the seed corn at the Penneys' request, and sent the crop money to them at the Penneys' request; that, when Mrs. Penney signed the notes, she said she wanted longer time; that he told the Penneys that, if he could help them in any way, he would be glad to do so; and that he made out the second note to be due September 1st, instead of being due in 30 days, and suggested that McIntosh & Cathro would probably carry it that long for them; that Mrs. Penney did not say she would not sign unless she got a contract; that she said to Mr. Penney that she would have to have an assignment of the contract from him, if she signed the notes; that he did not remember her saying that she would have to have a direct contract before she signed.

W. H. McIntosh testified that he had known Laura D. Penney since the fall of 1915, and Ken E. Penney since the fall of 1916; that McIntosh & Cathro entered into a written contract with Penney in June, 1916; that the $2,000 payment mentioned in the contract was made by Penney's giving his note, and that on this note was paid $573.46; that the $2,000 note, with the credit thereon, was renewed in consideration of Laura D. Penney's signing the two notes in suit; that neither of the defendants ever asked for a transfer or assignment of the contract; that the renewal notes, the notes in suit, were sent direct to Penney by mail, at his request, and in compliance with the request in his letter, in which he said that both he and Mrs. Penney would sign.

F. W. Cathro testified that the notes in suit were given to take up the $2,000 note, with the credits thereon, mentioned in the contract; that McIntosh & Cathro had no agreement with

Laura D. Penney to assign or transfer the land contract to her; that no one was authorized to make any such agreement; that neither of the defendants ever asked for an assignment or transfer of the contract.

At the trial, plaintiffs tendered to Laura D. Penney, for her execution, their contract, identical in terms with the original contract, signed by Ken E. Penney, and it was refused.

We have examined the evidence carefully, and conclude that the facts shown by the competent evidence do not furnish the slightest proof that Collins was the general agent of the plaintiffs, with authority to transact business for them with the defendants. Much of the evidence which counsel for appellants claim is sufficient to support an inference of agency, is manifestly incompetent. The only question of which the record will at all warrant a discussion is the contention of appellants that there was evidence to warrant the jury in finding that Collins was the agent of the plaintiffs for the limited and particular purpose of procuring the signature of the defendant Laura D. Penney to the notes in suit, and that such question should have gone to the jury.

It seems that Collins and the defendants met while they were transacting business between themselves. In conversation, the transaction between the plaintiffs and Penney arose, and Penney's inability to pay the $2,000 note, with the credit on it, was talked about; and Penney wrote to the plaintiffs, stating that he had a talk with Collins, and at his suggestion was writing asking them to send him two notes in amount equal to the amount of his indebtedness, one due in 30 days, and one in 60 days, and that the notes would be signed by himself and his wife. In answer to that, plaintiffs mailed to Penney two notes for $771.83 each. When the notes came, the Penneys and Collins met again. It seems that the Penneys wanted one of the notes to fall due at a later date, and Collins wrote up one note as they wanted it, and returned the notes to the plaintiffs. There is no competent evidence to show that Collins had any authority from the plaintiffs to even do what he did do in regard to the notes. Collins suggested that it would probably be satisfactory to the plaintiffs that one of the notes would become due at a later date, and wrote up the note accordingly for them. Even if it is

conceded that Collins was the special or limited agent of the plaintiffs, to get these two notes signed by Penney and his wife and return them to the plaintiffs, that would not carry with it the authority to make the contract which the defendants claim was made as a condition to Laura D. Penney's signing the notes.

There is no claim that there was any express authority reposed in Collins to make the contract which defendants claim he did make, to induce the making of the notes in question. We take it that, under their theory, he was, at most,

2. PRINCIPAL AND AGENT: special agency.

only a special agent, and, under the principles of law applicable, his authority was limited to the particular business of procuring their signatures to the notes; and that they were bound, in dealing with him, to know that they did deal with him at their peril, and that they must inquire into the nature and extent of his authority, and deal with him accordingly. Assuming it to be a fact that Collins had authority to secure the signature of the defendants upon the two notes, it would confer upon him only such implied powers as it might ordinarily be expected would be used by an agent doing that kind of business. *Lee v. Conrad,* 140 Iowa 16; *Holmes v. Redhead,* 104 Iowa 399.

It appears conclusively that the plaintiffs had no knowledge that any such contract had been made by Collins with the defendants, if, in fact, it was made, until defendants filed their answer.

Counsel for appellants argue that, assuming that Collins was the agent of the plaintiffs to procure the notes in question, an acceptance of the notes by the plaintiffs would necessarily ratify the contract made by Collins, even if Collins had no authority to make such contract. We think that is not the law applicable to this case. Plaintiffs had no knowledge or intimation of such a contract's having been made, at the time the two notes in suit were returned to them, signed by the Penneys, and not until defendants filed their pleadings in this case. Plaintiffs could not ratify and adopt an act about which they knew nothing. As supporting this doctrine, see *Roberts v. Rumley,* 58 Iowa 301; *Groeltz v. Armstrong Real Estate Co.,* 115 Iowa 602.

The trial court was without error in directing a verdict for the plaintiffs, and the case is—*Affirmed*.

Weaver, C. J., Ladd and Stevens, JJ., concur.